Thank you, Your Honors. My name is Steve Zabel, and I represent the plaintiff and the appellant in this case, Tri-Star Theme Builders, Inc., PCL Construction Services, Inc., which I'll hopefully be able to refer to as, for simplicity's sake, it's just Tri-Star PCL for the rest of this argument. Your Honors, the primary issue on this appeal concerns a coverage promise that OneBeacon gave my client back in 1998 and 1999. In 1998 and 1999, my client was involved in a construction project building a huge resort hotel casino for the Colorado River Indian Tribes. Involved in this construction project was a subcontractor of PCL, Golden West Mechanical, the plumbing subcontractor on this huge project. In 1998 and 1999, at the time of ongoing operations, OneBeacon promised Tri-Star PCL that it would provide insurance coverage for all liability arising out of Golden West's ongoing operations for no coverage promise, but I want to make two points concerning this coverage promise. First of all, the arising out of language is very broad. It's a comprehensive grant of coverage that says, at the time of ongoing operations, that we, OneBeacon, will provide you, Tri-Star PCL, with coverage for all liability arising out of those ongoing operations. And, as how to interpret, and this is probably the most important thing I'm going to say today, Your Honors, the words ongoing operations. The Arizona Supreme Court says that it is a fundamental that a court ascertain and give effect to the intention of the parties at the time a contract was made. So, when you're looking at this ongoing operations language, you're looking to see if the operations were ongoing at the time the contract were made. Not when the damages occurred, not when a lawsuit might have happened, not when the policyholder tendered coverage, but you look to see if operations were, in fact, ongoing at the time the coverage promise was made. Now, if I understand the district court's analysis correctly, one of its concerns was that if we interpreted ongoing operations the way you had suggested, that would essentially mean that the additional insured had the same scope of insurance as the primary insured. And the district court thought the language such as only with respect as limiting, and then at the end of that paragraph it says the additional insured status ends when Golden Conditions for that insured are completed, thought that those limiting provisions meant that PCL was getting something less than what GWM had bargained for. Well, Your Honor, I'm glad you brought that up, because that language where it says that the additional insurance coverage ends when your work for that insurance ends, that's not in TriStar PCL's coverage provision. That's in a different coverage provision within the policy that only applies, it's an automatic additional insured provision that says, okay, if you're required by contract to give somebody additional insurance, this is what you're going to get. But TriStar had its own policy, and neither one beacon nor TriStar PCL has ever said that the default provision has it. And that default provision that doesn't apply to PCL shows wonderfully how one beacon could have written this provision to have some sort of limitation. Now, when you say you have your own coverage, you're referring to the endorsement, right? Or are you saying you have a separate insurance policy with one beacon? No, the endorsement that gave coverage to TriStar PCL said in its entirety, you've got coverage for, quote, liability arising out of your ongoing operations for that insured on the resort project designated in the schedule, and only to the extent of liability resulting from occurrences arising out of Golden West negligence. Within the form part of the policy, there's kind of a default provision that applies only when there isn't a specific endorsement like there was in our case for us. So this other endorsement with the limiting language doesn't apply to TriStar PCL. We have our own deal, and our own deal doesn't say that your coverage will end when your work for that insurance ends. In fact, there's nothing in this provision that limits in a time sense when the accident must occur in order to get coverage. Now, the district court said, because he was concerned you raised, Your Honor, was that he was concerned that this would essentially give PCL co-equal coverage with a completed operation. And I think in my brief I explained how they're very different. Ongoing operations gives PCL exactly what it asked for. In its subcontract agreement with Golden West Mechanical, I want you to give me coverage for premises liability, which is while they're on and completed ops. So they got ongoing operations, which doesn't have a limiter, but however, is different from completed operations because, for example, if this would have been a year 2000 policy, for example, and there would have been completed operations coverage, then it would be covered. But a year 2000 policy with ongoing operations wouldn't be covered because there were no ongoing operations in the year 2000. However, there were in 1999. And the whole point, the whole point of interpreting an insurance policy, and I'm not sure, Your Honors, how much time I have left because this started a little late. You have 10 minutes, it says. It should show up on your... Yeah, it got started a couple minutes late, and I don't know. It was about two minutes. Okay. All TriStar PCL asks in this case is to have this coverage provision, the one that applies to it, not to other people who might not have their own separate deal, just have the exact words of this written. If somebody is standing in my living room, Your Honor, at the beginning of a three-week construction project, there's a plumber banging away in my bathroom and says to me, I'm going to give you coverage for all liability arising out of that person's ongoing work as they're here for the next three weeks or months. No reasonable person would think that what they really mean is, oh, only during the time this person is here. And if the day this plumber drops his or her tools, hops in their pickup truck and they're half a block down the road and my house blows up because of bad plumbing work, I don't get coverage. The words arising out of ongoing operations when made at the time of ongoing operations doesn't suggest any time limitations on when the occurrence giving rise to coverage must happen. Counsel, Judge Gould, if I could interject a question or two. First of all, how, given your interpretation of the coverage language, would it mean anything different if it had just said arising out of operations? Yes, Your Honor. Your position seems to be that arising out of ongoing operations means the same thing as if it had just said arising out of operations. If I gave that impression, Your Honor, it's a mistaken impression. No, I believe that arising out of operations would be broader. Because, for example, if there was a arising out of operations provision, say that was in a 2002 policy, and the occurrence happened in 2002, that 2002 policy would be triggered because, of course, it did arrive out of Golden West, but the ongoing operations language would save the insurer under the 2002 policy. Only the insurer on the hook at the time of the ongoing operations in 1999 would be on the hook for that sort of law. Okay. Thank you. Thanks for clarifying that. My other question is that we have cases from other jurisdictions, like I think Pardee in California, and there are maybe some others, that interpret similar policy language and come to a different result than your position in this case, I think. I realize Arizona doesn't have to do the same thing as California, but what's your position? How would you distinguish the Pardee case? The Pardee case and the Weitz case out of the Colorado Courts of Appeals both found the intent of this language. Both read the words during or while as a limiter of time because they went outside of the written words and went to an internal, and in my mind very obscure, internal insurance industry publication called the Insurance Services Organization Publication. And in that publication, yes, it is true, an internal actor in the insurance industry gives his or her interpretation of this thing as a narrow interpretation that was eventually adopted by the Pardee and the Weitz courts. But under Arizona law and under the law of most states, it is the understanding of an ordinary person, not a person trained in the law, not somebody in the insurance industry, and nobody that I know even knows what the insurance industry organization publication is and the average insured is not going to look to this obscure publication to find some intent. It cannot trump, this obscure publication cannot trump the plain language of the policy, which simply says at the time of ongoing operations, I am going to give you coverage for anything arising out of those ongoing operations, TriStar PCL. And I think I'll reserve the rest of my time for rebuttal unless there's any more questions. Thank you. Good morning. My name is Gina Sluga, and I represent One Beacon Insurance Company, the appellee in this case and the defendant at the trial court level below Judge Tielburg. I have prepared remarks, but my primary goal today is to be sure that any questions that you have regarding our position in the briefing are fully answered for you. So please, if there are anything on your mind at all, start now rather than having me get into some prepared remarks that might be irrelevant. Okay. I'll start now. Please do. I will say, speaking for myself, that if this were an ordinary contract, I think the district court got it right. But we're dealing with a specific rule that is he analyzed as a lawyer, he engaged in a sophisticated legal analysis, he compared contract terms with contract terms, he relied on cases in other jurisdictions, which in effect set out what I would call the legislative history of this clause. But that's not the standard in Arizona. You don't look at it as a lawyer or as someone who has done research into the legislative history of the clause. And it seems to me that the district court recognized that the language of the clause itself actually covered this claim, and he was limiting the language of the clause by reference to what I would call a very sophisticated legal analysis, which in turn depended upon not only comparison of other clauses in the agreement, but with the legislative history of this clause in the insurance industry. And he even says, and I forgot my glasses, so forgive me if I read a little slowly, any claim for personal will necessarily relate back to the period of time when the subcontractor was working on the project. This is so because any action in the causation chain that a subcontractor sets in motion will inevitably relate back to the subcontractor's negligent actions, which can only occur while the subcontractor is still working on the project. This language by itself, it seems to me, is sufficient. If you don't look at comparative clauses elsewhere in the agreement, then they don't have anything to do with this. If you don't look to the legislative history of this clause, this language, as the district court himself or herself, I don't remember, acknowledged, by itself is sufficient to cover this incident. And in Arizona, it seems to me that that's enough, that the rule is, is that in interpreting the terms of an insurance contract, the courts in Arizona undertake the perspective of a layman untrained in law or insurance. They're not concerned with what commercial customs are in the insurance industry, but rather what an ordinary person's understanding of the policy will be. Now, how do you deal with that? I'm, I'm, I would be prepared to agree if this weren't, if we weren't dealing with Arizona's rule of construction, that, that the district court, if we do as a statute, perhaps, that the district court got it right. But we're dealing with a particular rule of construction here, and the district court acknowledged that the actual language itself could cover this event. Let me address that very specifically, Your Honor. When one beacon issued this endorsement that added TriStar PCL as an additional insured to this policy, it didn't eliminate or obviate from this insured any of the other terms and conditions and exclusions of Golden West Zone policy. Those terms and conditions remain, and all this endorsement does is it says that if there's a lawsuit that brings claims that arise out of Golden West's ongoing operations, this insured also can be an insured under the policy, subject to all of its terms, all of its conditions, all of its exclusions. One of those exclusions and one of those, some of the language in that policy, throughout the policy, and in fact, throughout most of the standard commercial general liability policies in the market today, which are promulgated by and written by ISO, there's nothing obscure about that organization, you'll see in there, throughout the policy, a distinction between ongoing operations and completed operations. There are distinct coverages. And it's important that they are. The contract uses the word completed operations, and I, as a layman, had never heard of whatever it is, I-O. ISO? ISO. And I never knew until I started reading the cases that are cited that people actually buy insurance after a project is completed to cover claims that first manifest themselves after the completion of the contract, even though they relate to negligence that occurred during the contract. I never even knew there was such a policy. All I'm saying is, is that you're ignoring, it seems to me, the rule of construction of these policies in Arizona. How is a layman supposed to know this? I mean, in reading this, I was educated about this clause and where it came from. But it just seems to me, if you wanted to say that it only covers, provides coverage for claims that manifest themselves, or negligence that manifests itself during the term of the contract, it's easy to use that language. And a layman would understand it, and you wouldn't have to go comparing clauses in other parts of the contract. You wouldn't go do legal research from other states. You wouldn't do research into the legislative history of the clause. And I think that's what bothers me. I agree, as I said, and I won't say it anymore, if I were dealing with an ordinary contract, I think that the district court got it right. And I think where it got it wrong was he may have recited Arizona's law of how you construe contracts, but he just didn't apply it. Well, we can't ignore the rest of the contract either, though. And what we have are provisions throughout the contract that have been upheld in a lot of different states in a lot of different contexts that show that because of the business risk exclusions in a policy, because of the kind of risk that commercial general liability insurance is there for, damage that occurs during the ongoing operations of a subcontractor or even a general contractor aren't going to be covered by exclusions J-5 and J-6, which are business risk exclusions. The thinking here is that these policies aren't performance bonds, and Arizona law is very clear on that. But these policies are here not to protect against the risk that this contractor isn't going to do his work, but to protect against the risk that something is going to fortuitously go wrong and cause property damage down the road. Exclusions J-5 and J-6 are there to show that if a subcontractor is working on a job site and a problem occurs with his work, there's clear problem, while he's there on the job site, the expectation is that the insured is going to fix the problem. He has a contract. He's going to do that work. So if there's damage while the insured's on that job site, that's not the kind of damage covered by a commercial general liability policy. That's the kind of damage that would be handled by a performance bond. And, in fact, the companies that issued the performance bonds in this case were sued in the underlying case and did come into play in making the tribes whole. But isn't that doesn't in that involve a separate issue? In other words, it involves an exclusion. It doesn't deal with the issue of what, when, or, you know, this Clause allegedly returns on when the particular negligence manifested itself. What you're talking about, it seems to me, is a separate issue of suppose it applies, are there any exclusions that would operate separate from this particular Clause? And that's what I think J-5 and J-6, if my memory serves me correctly, specifically allude to. In other words, that it presumes coverage, but then it excludes certain things from coverage. But we're dealing here, for the moment, with this particular language and this, quote, ongoing operations. I think part of the concern that we have here is that both in the briefing and in argument today, counsel has suggested that what this endorsement says is that it provides coverage for all liability arising out of these operations, or any liability. The words all and any are not there. Such inclusive words aren't here. These this little provision. Isn't that a separate issue from the issue that I thought that the district court decided? That is, when does the district court's determination, as I understood it, it was based on when did the fact that negligence occurred manifest itself? In other words, if it manifested itself after the work was completed, then there's no coverage. But if it manifested itself when the work was ongoing, there was coverage. It seems to me that's a discreet and separate issue from whether there are any other exclusions assuming there was coverage. We're confusing a couple of concepts here. First of all, in any commercial general liability policy, the policy is going to provide coverage only for damage that occurs during the policy period. That's not an ongoing operations issue or a complete one. During the policy, this is this is the problem. And what they did is the district court recognized in the portion of his opinion that I read to you, he recognized this actually occurred when they were working, when the when it was ongoing. And and and you're taking the your basic claim is that it doesn't it doesn't provide coverage because they didn't discover it. That didn't manifest itself until after the ongoing operations were complete. That's the as I see it's a threshold issue here. Forget about whatever other exclusions there might be assuming coverage. First of all, I disagree that the complaint against Tristar in the underlying case did allege property damage that occurred during that period of time. The complaint very specifically said that in the relevant window of time, the ongoing operations time before the resort opened, what had happened is that the tribes had That is quintessentially performance bond kind of problem. And in fact, in the six tolling agreements that were executed between the tribes and PCL and the surety bonds, they specifically noted the punch lists and that work. That's a performance bond issue. It's not property damage, as that term is used in any commercial general liability policy. And as the Arizona Supreme Court insists upon, faulty workmanship is not covered under a CGL policy. That just matters, though, if we agree with the district court's interpretation. Isn't that right? The interpretation of the district or the policy? Well, the district court says ongoing operations, the property damage has to manifest during the time when there's ongoing operations. And so the complaint alleges punch list before the opening of the casino. And I understand your argument to say if you agree with the district court's interpretation of the policy, that only property damage that's discovered during that period is covered, then it makes a difference as to whether a punch list is property damage or not. It's really not about when the damage is discovered. It's about when the act that causes the damage occurred and whether to go right to the language of the endorsement, whether the liability here arose out of the or whether the liability arose out of the completed operations. That distinction is very important in the law because throughout this country, not just in the context of additional insured endorsements, but also in the context of cases talking about policies that contractors purchase for themselves, courts have held there's no coverage for construction defect claims during the ongoing operations period. The exclusions, J-5 and J-6, don't allow it. Coverage for construction defects, if at all, is granted in the products completed operations hazard. It's exactly the issue that the Western District in Washington very recently looked at just weeks ago in the Canal and Demerty v. Adair Homes case. What they said is there's no coverage for construction defects during the operations period because of J-5 and J-6. There's other kinds of claims that can be covered then. If you've got job site injuries, if you have a crane collapse during an ongoing operations period that destroys property of third parties and others, that's covered. But the traditional construction defect lawsuit, a lawsuit arising out of bad work that needs to be repaired, restored, replaced, can't be covered at all during the ongoing ops period. We can't blur the line between ongoing ops and completed ops because here, if Tristar, PCL, had sued Golden West in the underlying case, Golden West had completed operations coverage. Golden West would very much have wanted us to insist that this was a completed operations claim because that's the only way Golden West could have had coverage for this claim. If it's not a product-completed operation hazard, J-5 and J-6 don't allow coverage. So are you — is your argument turning on J-5 and J-6 as opposed to — as opposed to this business about what manifests itself and what doesn't and when? No. The — we're getting caught up in manifestation, and that's the problem. The issue is, does the liability arise out of something that happened, the occurrence during the ongoing operations period, or does it arise out of bad work that was given over to the owner? That's the distinction. J-5 and J-6 is just the most obvious place we see that fleshed out in policy. But it's also in the pollution exclusion. The difference is noted in exclusion L, your work exclusion. Throughout the exclusion — the policy, there's differences between ongoing operations and completed operations. Okay. So tell me again — Oh, go ahead. I'll ask afterwards. Tell me again what, in your view, the endorsement does cover. The endorsement would cover — construction job sites are inherently dangerous places, and there are a lot of risks that need to be covered for the ongoing operations. Risks of bodily injury. New York has looked at cases where an insured was dealing with ice in a parking lot. That was what the subcontractor was supposed to be doing. And while they were out there, somebody slipped and fell on the ice. While they were out there, before they'd finished the work. That's covered. Because the act arose out of the ongoing operations of the person who was removing the snow. There's another New York case where we've got a subcontractor who's got a bunch of debris on a job site. It was supposed to have been removed. That was part of the contractual obligation. Part of the operations was to clear it. Someone was injured. What if somebody is injured during the ongoing negotiations? They fall or something hits them, but they sort of — they feel okay. They brush it off. And then after the contract is completed, they go to a doctor and he says, well, you know, this is a serious injury that you have. Covered. It's covered. Absolutely. Because the act, the injury, arose out of what happened on the ongoing time. And there's no exclusion like a J-5 or J-6 to preclude bodily injury. Well, that gets back to my point. It's really — everything occurs regardless of when it manifests itself during the ongoing operations. If you tell me that what this case is really about are the exclusions, then I can understand — I can understand that argument. I go back and rethink my initial impression. But that's not how this — as I understood the district court's opinion, it was not how I understood some of the cases that are cited, including the cases that contain what I've called, in quotes, a legislative history. If you hold this to be covered, no complaint will ever not be covered. No subcontractor can protect itself from the need to be sucked into liability protection. Sure you can, dear, and if we held it, you could correct the language of the policy to make it clearer. That's always — that's always possible. And these industry forms that have been promulgated by the Insurance Service Office for over 10 years and have been interpreted across this country were going to change that here. Over 10 years, the reason they promulgated — 10 years ago, the reason they promulgated it was because it wasn't clear, and they wanted to make it clear. But the trouble is, the way they promulgated it didn't make it clear to a layman. They didn't make it clear. They offered an alternative coverage. You can still buy coverage, an A.I. endorsement that would cover all claims arising out of the work of a subcontractor. That's still available. This is different. I am — Judge Gould, I think, had a question. Judge Gould. Well, it's — there are two questions, but I'll frame them quickly. The first is, does Arizona have a maxim or provision in their law stating that ambiguities in the policy are construed in favor of the insured? Yes, but only if we're truly facing an ambiguity and only if the parole evidence doesn't allow us to interpret it. Right. I was going to come to my second question. If there is such a provision, then I want to hear your best argument as to why this policy is not ambiguous. Because there's nothing — What I — and here's what I — I hear the appellant arguing. Ongoing operations means they were ongoing at the time the contract was entered and where the negligent act was made. Then I hear the insurance company saying ongoing operations mean they have to be ongoing when the damage is manifested. So that's — if that's an ambiguity, a fair ambiguity, the insurance company may have to answer that maxim. Well — And if it's not, what's the best position you've got on that? We can't pretend there's an ambiguity because there's one sentence in one endorsement that the insured pretends not to understand. And I use the word pretend purposefully. PCL is one of the largest construction companies in this country, and there is nothing before this Court, no affidavits, nothing in the record to suggest that it was misled or confused or didn't have a risk management team that knew exactly what this coverage was. There's nothing to support that. And I'm a little concerned that we're raising hypotheticals that don't apply here. So we can't pretend that this single sentence creates an ambiguity. If we're concerned about an ambiguity in the contract, we read the contract as a whole. We read the contract, all of the terms, all of the conditions, all of the places that discuss the distinction between the very unambiguous words ongoing versus completed. The policy even says work is completed when the contractor is done working on the project. There's nothing ambiguous about that. If you're concerned about it and you think there's ambiguity, you look elsewhere to figure out what was intended by the parties. Here, there's nothing in the record to suggest that this insured really intended something different, as opposed to creative arguments made by counsel in the litigation stage. The ISO forms discussed in Party and in Weitz and in Hartford and now in the cases that have cited to those cases since the briefing, all have said the distinction between completed and ongoing operations coverage is clear and unambiguous. Here's what the intent was by the entire insurance industry in drafting these forms. And we looked to that intent to interpret, especially when we don't have evidence of an intent to the contrary from this particular insured. And it's only after we've examined the entire contract and we've looked to everything in our record about intent and what really these were intended to mean when this insured chose to buy only the ongoing operations endorsement and chose not to buy the all damage arising out of the your work endorsement, that that choice, that choice not to pay the increased premium to buy the coverage that would have included completed operations coverage, there's nothing ambiguous there. If after going through all of that, a court still were to find ambiguity, yes, Arizona courts will do everything they can to protect the intent of the parties. And if they can't discern that, then and only then do they construe the contract against the drafter. Counsel, just to follow up on your argument, if if intent is the key to this provision, then is summary judgment the wrong way for it to be resolved? And should should the matter be remanded for a trial where there'd be findings of fact as to what was what was intended initially? It's a good question. Only trial would only have been appropriate or necessary if here there had been evidence in the record to create that question of fact. But again, the litigant against whom One Beacon is litigating is one of the largest construction companies in the country, and it had been working with Marsh, one of the largest insurance agencies in the country, to meet its insurance needs. There is nothing in the record from those parties that could really in good conscience have said that they intended something different here. We have arguments of counsel in the record, but we don't have affidavits or evidence that could have created enough of a question of fact truly on the intent, Your Honor, to have warranted a trial on the merits of the issue. How do you get around the language that in interpreting the terms of an insurance contract in Arizona, Arizona undertakes the perspective of a layman, one untrained in the law or insurance, and your argument is that they're trained in the law of insurance, that we have some sort of exception to this rule of construction in Arizona? Well, first of all, my real argument is that there's nothing ambiguous on the difference between completed and ongoing. I'm not suggesting there's ambiguity there. I think that the difference between when work is ongoing and when work is completed is crystal clear. It's not necessarily a question of ambiguity. It's how a layman would read it as opposed to a judge who is sophisticated in the law and who has gone to other jurisdictions and looked at legislative history and how 10 years ago this clause came to be adopted. And the question is, a layman doesn't do that. I wouldn't necessarily do that. As I said, I got an education in all this, in reading the briefs and the cases in this case, I was concerned about what you do about the rule of construction in Arizona, which is suggested it's a layman, untrained, unschooled in the law or the practice of insurance. And you were just arguing that they're not a layman, unschooled in the law, that they were represented by Marsha MacLennan, who was a schooled in insurance and all of that. Well, if there's authority in Arizona, that creates an exception fine. Well, the reasonable expectation doctrine in Arizona does look to what this insured subjectively thought about the policy. So to the extent that we're talking about what was expected or intended, that's exactly what the Arizona courts would require, is a suggestion that this insured subjectively thought that. And again ---- And did you have a cite for that, or was it in the brief and that missed it? Gordinier and Darner Motor Sales would be the key cases in Arizona talking about the reasonable expectation of coverage doctrine. And I do believe that both are cited in the briefing, yes. But again, here we can't pretend that this single sentence in this endorsement is the whole policy. And if you read the whole policy, you don't need to be trained in insurance to see and appreciate the difference between that which is ongoing and that which has been completed. All right. If there's no ---- Are there other questions? Thank you. A few quick points. First of all, I don't think we need to get into subjective intent, Your Honor. I believe that the words of this insurance policy should control. Second of all, this argument that these policies don't cover construction defense has been rejected. The Lenar court says, while faulty work alone isn't covered, if that faulty work results in damage to other property, it's covered. If you look at paragraph 33 of the complaint, it says, bad plumbing work resulting in damage to other property over and over and over again. As to exclusions J5 and J6, I would respectfully, if I could give the court a cite of a case that came out after the end of briefing. You can give the citation to the clerk afterwards, but you can explain what your argument is. On August 3rd of 2010, the Arizona Court of Appeals came out with the Desert Mountain Properties case, and they interpreted language very similar to the exclusions J5 and J6 in the one-beacon policies, and they said they just don't apply when there's allegations of resulting damage, as there are in this case. And I have nothing further, unless there's more questions. Do you put in anything? I know you say the subjective understanding or intent of the parties is not relevant. But do you do you did you put in anything on what the intent or understanding of your client was? I did not, Your Honor. And the fact of the matter is this happened a long time ago, and I'm not sure they have an understanding other than the plain language of the policy, but to suggest that they could have looked at the party and the White's cases and things like that has got we have another problem with time, because this was 1998 and 1999, and all these decisions came after these policies were written. So Marsh, you know, PCL's Risk Management Department, they couldn't have been aware of these decisions. They just hadn't come down yet. Just the language of the words. We just ask that the words be applied without any limiting language suggested from an outside source, such as a private, self-interested industry organization like the insurance company. Suppose, for argument's sake, we accepted your interpretation of this ongoing operations clause. Are we able to decide the issue of the J-5 and J-6 exclusions, or would we have to remand? It's all in front of you, Your Honor. You know, I didn't have a chance to cite this case, but I did make my arguments against the applications of exclusion, and I think it's appropriate when case law comes down directly on point from a controlling jurisdiction to also add that if it comes down after the end of briefing. But yes, Your Honor, you could decide it all. How would we know the exact kind of damage that was caused during your definition of ongoing operations and know whether or not it came within an exclusion without some development of the record? For the duty to defend, you just look at the complaint, and the complaint says that there's plumbing damages that resulted in damage to other property, that the damage has occurred both before and after the completion of construction, and if later on we have an indemnity fight, we'll have to prove exactly when these damages occurred. But for the duty to defend, the duty to defend is triggered by the mere potential that any of these fell into the coverage periods, and that's clear from the complaint. Thank you. Thank you. All right. The case of TriStar Theme Builders v. One Beacon Insurance Company is submitted.
judges: Korman, Hall, Gould